# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

BARBARA J. ROMERO,

      Plaintiff,

v.                                        CV 10-0580 WPL

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

## MEMORANDUM OPINION AND ORDER

In 2006, Barbara Romero applied for supplemental security income (SSI). (Administrative Record (AR) 75, 84.) The application was denied at the initial and reconsideration levels, and Romero requested a hearing before an administrative law judge (ALJ). The ALJ denied the application in a decision upheld by the Appeals Council. Thus, the ALJ's decision became the final decision of the Commissioner of Social Security. The case is before me now on Romero's Motion to Reverse or Remand (Doc. 20), the Response filed by the Commissioner (Doc. 24), and Romero's Reply (Doc. 25). Pursuant to 28 U.S.C § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment. After having read and carefully considered the entire record, I find that the Plaintiff's Motion should be granted and the case should be remanded for further consideration consistent with this opinion.

### STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted). A "decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* (quotation omitted). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See id.*

## SEQUENTIAL EVALUATION PROCESS

The Social Security Administration has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At the first four steps, the claimant must show that she is not working in substantial gainful activity, that she has an impairment that is severe enough to significantly limit her ability to do basic work activities, and either that the impairment meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, or that she is unable to perform the work she has done in the past. At the fifth step, the Commissioner must show that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## FACTUAL BACKGROUND

Romero alleges a disability onset date of March 1, 2003. (AR 12.) The Social Security Administration (SSA) denied her application for SSI benefits at both the initial and reconsideration levels. (*Id.*)  On August 6, 2007, she filed a request for a hearing before an ALJ. (*Id.*) On October 10, 2008, ALJ Mark R. Dawson held a hearing on Romero's application for benefits. (*Id.*) Romero testified at the hearing and was not represented by counsel. (*Id.*) The ALJ denied her claim for

benefits on March 4, 2009 and the Appeals Counsel denied her subsequent request for review on April 30, 2010.  (AR 1.)

Romero was fifty years old when she applied for SSI and fifty-three years old when the ALJ issued his decision, which became the final decision of the Commissioner. (AR 12, 17.) Romero received a high school equivalency diploma and is a Certified Nursing Assistant (CNA). (AR 99.) Her last job was as a CNA from 2002 through November 15, 2003. (AR 95-96.) Prior to that, she did assembly work, which consisted of packing and putting tags on items. (AR 96.)

Romero originally applied for benefits claiming disability due to a shoulder injury and arthritis in her back. (AR 95.) She informed the Field Office Interviewer that she had seen doctors for her shoulder injury. (AR 97.) These doctors included Carlos Esparza, seen from February 28, 2003 through August 19, 2003, Wood Lewis, seen from January 17, 2003 through August 2003, and Barrie Weiner Ross, seen during 2003. (AR 98.)

Romero was sent for a disability determination examination by Donald James Lacy, D.O., on November 4, 2006. (AR 139.) He stated that her complaints were a right shoulder injury incurred while lifting a patient in her last job as a CNA and low back pain. (*Id.*) He determined that she had a rotator cuff injury on the right shoulder and mechanical low back pain. (AR 141.) Regarding the rotator cuff, Dr. Lacy stated,

> I think the shoulder might need further investigation in so far as some treatment if it is exactly a rotator cuff tear it might require surgery which most people rehab quite well from it, but argues against rotator cuff tear as she has complete range of motion of the shoulder so it could be just a bicipital tendinitis or even maybe perhaps an inner joint injection might be appropriate for that. But it does not appear to limit her activities of daily living at this point.

(*Id.*) Regarding Romero's back pain, he stated that it appears to be mild and more mechanical, coming on many years ago. (*Id.*) He noted that she had been making tamales the week before, which

3

he opined is a "fairly labor intensive process." (*Id.*) He concluded that Romero "can be expected to sit, stand, walk in an 8-hour day with normal breaks and no need for assistive devices." (*Id.*) The only restriction he found was that Romero would be limited to lifting about twenty pounds only on occasion. (*Id.*)

The Residual Functional Capacity Assessment completed on November 16, 2006 by Janice Kando, M.D., concluded that Romero can occasionally lift and/or carry fifty pounds, can frequently lift and/or carry twenty-five pounds, can stand and/or walk for a total of about six hours in an eight-hour workday, can sit for a total of about six hours in an eight-hour workday, and can push and/or pull an unlimited amount in a workday. (AR 145.) She noted that, based on the objective evidence, she disagreed with Dr. Lacy regarding Romero's lifting limitations. (AR 150.) According to Dr. Kando, Romero's only postural limitation was that she could only balance on occasion. (AR 146.) Dr. Kando further concluded that Romero had no manipulative, visual, communicative or environmental limitations. (AR 147-48.)

Romero submitted additional information about her condition to the SSA, specifically that her back had worsened and that it was resulting in swelling and numbness to her left leg. (AR 114.) She advised that she had gone to Presbyterian Hospital on December 27, 2006 because she could not walk due to back and leg pain. (AR 115.) She received a morphine injection and was prescribed Vicodin for the pain. (AR 115-16.) Romero also stated that her right arm, including her shoulder, elbow, and wrist, would swell and that the swelling prevented her from doing housework. (AR 117.) She added that her back pain kept her in bed when it was painful, caused her legs to go numb to the knee, and caused swelling in the thigh.  (*Id.*) She advised that she could not stand for long at the store, that she had to sit before the back pain started, that she could not carry heavy things, that she had to do housework quickly, and that she needed help to accomplish most chores and activities.

(*Id.*) Romero said that she was looking into getting medical help to deal with the pain beyond using icy hot, hot pads, and aspirin, but that it was difficult to do so because she did not have insurance. (AR 118.)

The SSA requested the medical records from Presbyterian Hospital on March 8, 2007. Those records indicate that Romero was admitted on December 27, 2006 to the emergency room for right leg pain, back pain and flu symptoms. (AR 158-59.) Romero was experiencing sharp, shooting pain in her lower back and right leg after slipping while getting into a car. (AR 159.) The hospital instructed Romero to get a primary care provider to evaluate and treat her high blood pressure and back pain. (AR 160.) The hospital administered Morphine and Phenergan. (AR 161, 163.) She was prescribed Vicodin for a short-term period. (AR 166.)

On approximately March 29, 2007, Romero again informed the SSA that her back had worsened and that her shoulder and elbow would become swollen with any repetitive movement. (AR 123.) She stated that she had an appointment with UNM Hospital to register for an appointment with a doctor and to get referrals. (AR 125.) She further reported that she could not lift her arm to dress herself without experiencing pain or a popping noise. (AR 126.) She repeated that she could not stand or walk for longer than it took to finish housework or grocery shopping due to back pain. (*Id.*)

At some later point,[1] Romero reported to the SSA that she was taking a number of medications prescribed by Dr. Macias, including Metformin and Actos for diabetes, Lisinopril and HCT2 for hypertension, and Cyclobenzaprine and Tramadol for back pain. (AR 130.) She reported having an injection in her lower back on September 12, 2008 by Dr. Stevenson. (*Id.*) She listed Dr.

---

[1] The table of contents to the Administrative Record states that this information was reported on September 19, 2008; however, no date appears on the pages of the document in the record. (AR 130-31.)

Macias as her primary doctor. She stated that she was referred to have therapy on her back at Medical Arts and that she had an MRI "which was reffered [sic] as shoulder impingement [sic] UNMH/Radiology." (AR 131.) Immediately prior to the ALJ hearing, Romero submitted her medical records from Drs. Macias and Stevenson as well as from physical therapy. (AR 179-97.) The records indicate that, on September 12, 2008, Romero reported difficulty standing for more than an hour and that sitting and an over-the-counter pain reliever helped to ease the pain. (AR 191.) Dr. Stevenson administered a trigger point injection at that time. (*Id.*) The doctor instructed Romero to take ibuprofen, rest, and use ice and heat. (*Id.*) Dr. Stevenson also referred Romero to physical therapy based on "recent acute excerbation [sic]" of chronic back pain. (AR 180.) The physical therapist's notes from September 30, 2008 indicate that Romero's gait was unremarkable and that her lower lumbar was especially sore. (AR 181.)

Following the ALJ's decision, on April 22, 2009, Romero wrote the SSA a letter describing her medical condition and her disagreement with the ALJ's decision. (AR 62.) She stated that she was still experiencing back pain and that it was traveling into her neck. (AR 64.) She stated that she was experiencing popping and pain that was so intense that she must lie down; she got no relief from sitting. (*Id.*) She stated that the pain was stronger on some days than others but that it was constant. (*Id.*) She further stated that she had begun taking more medication for diabetes and hypertension. (*Id.*) She added that she could not reduce her weight because of difficulty moving much with the pain. (*Id.*) She further stated that she could not be on her feet for longer than an hour because the pain would begin after standing for that long. (*Id.*) She further alleged several problems with the examination by Dr. Lacy, including that he only spent thirty minutes with her, he had to help her get up from the exam table, and she did not have to undress for any part of the exam. (AR 65.)

Romero also forwarded additional medical documentation to the SSA, including several laboratory reports (AR 198-203), x-ray reports (AR 204-07), an MRI report (AR 132-37), and records regarding her treatment by Dr. Shelley (AR 208-27). On April 4, 2009, Romero's doctors took x-rays of her spine. Based on the test, the doctor concluded that Romero had "[s]evere degenerative changes of the lumbar spine and moderate degenerative changes in the inferior cervical and the thoracic spine." (AR 202.) The final report on Romero's MRI was completed on June 24, 2009 and Romero sent it to the SSA on July 7, 2009. (AR 132-37.) The conclusion drawn from the MRI was that Romero had "degenerative changes" in her cervical spine "including a right paracentral disk extrusion at C7-T1," and that she had "multilevel degenerative changes" in her lumbar spine with an incidental note "of mild right hydronephrosis." (AR 134, 136.) Furthermore, Romero had several appointments with a pain doctor, Dr. Shelley. He administered a trigger point injection (AR 223) and a spinal epidural steroid injection. (AR 226-27.) He further diagnosed her pain as being caused by moderate to severe degenerative disc disease/degenerative joint disease of the spine on September 17, 2009. (AR 220.)

## ALJ AND APPEALS COUNCIL DECISIONS

In this case, the ALJ concluded at step five that Romero had not been under a disability since September 14, 2006, the date that she filed her application for SSI. (AR 12.) At step one, the ALJ found that Romero has not engaged in substantial gainful activity since September 14, 2006. (AR 14.) The ALJ found at step two that Romero has severe impairments of obesity, right shoulder and bicep tendinitis, and lumbar strain/sprain. (*Id.*) The ALJ noted as well that Romero was diagnosed with hypertension and type II diabetes. (*Id.*) The ALJ stated that Romero had "been treated conservatively with physical therapy and steroid injections for right shoulder, right arm and low back pain from June to September 2008." (*Id.*) To make this finding, he looked to Romero's records

7

from her visit to the emergency room in 2006, her treatment records beginning in June 2008, and the physical consultative examination by Dr. Lacy from November 2006. (AR 14-15.) The ALJ concluded at step three that neither Romero's impairments nor the combination of those impairments met or medically equaled one of the conditions listed in the appendix of the relevant disability regulation. (AR 15.)

Prior to proceeding to step four, the ALJ made a determination as to Romero's Residual Functional Capacity (RFC). The ALJ found that Romero has the RFC to perform a full range of light work. (AR 15.) The ALJ rested his conclusion on all symptoms, the extent to which the symptoms could be accepted as consistent with objective medical evidence, and opinion evidence. (*Id.*) He first listed the symptoms that Romero alleged during the hearing and in various statements to the SSA, including that her back pain was progressively worsening, that the pain felt like a fever and pressure up the spine, and that the pain affected her daily activities including limiting her time in a store to one hour, forcing her to do dishes quickly, and cooking less. (AR 16.) The ALJ stated,

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limited effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(*Id.*) The ALJ went on to state that "[t]here was no imaging at all in the medical records and very little in the way of physical findings." (*Id.*) He found that Romero has been able to work sporadically, care for her children, do housework and cook despite the pain. (*Id.*) He asserted that the medical records "do not show an organic cause for what she has termed 'excruciating' pain" and noted that she has been able to deal with the pain by taking over-the-counter medication aside from her visit to the emergency room (*Id.*) Finally, he attributed great weight to the opinion of the

examining consultant, Dr. Lacy, because the ALJ found it "consistent with the record as a whole" and because "there are no treating source opinion statements in the record." (*Id.*)

At step four, the ALJ found that Romero has no past relevant work. (*Id.*) At step five, he considered that she was fifty years old when the application was filed, that she has at least a high school education and can communicate in English, and that she has no transferable job skills. (AR 16-17.) He also considered the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, App. 2. (AR 17.) He stated that if a claimant can perform all exertional demands of a given level of exertion, the medical-vocational guidelines direct the disability finding. (*Id.*) He further stated that the guidelines are only a framework where the claimant has a nonexertional limitation. (*Id.*) The ALJ then concluded, "Based on a residual functional capacity for the full range of light work, considering the claimant's age, education, and work experience, a finding of 'not disabled' is directed by Medical-Vocational Rule 202.13." (*Id.*)

Romero requested that the Appeals Council review the ALJ's decision. The Appeals Council denied that request, finding no reason to review the ALJ's decision. (AR 1.) It reviewed the new evidence submitted by Romero, which included the MRI views and x-ray reports of her spine and the medical records from Brian M. Shelley, M.D. (AR 2.) The Appeals Council noted that the x-ray reports indicated severe degenerative changes to the lumbar spine and moderate degenerative changes in the inferior cervical and thoracic spine. (*Id.*) However, it refused to consider these records, stating that the new information was dated after the ALJ's decision and concluding that it "does not affect the decision about whether you were disabled beginning on or before March 4, 2009." (*Id.*)

Romero challenges the ALJ and Appeals Council decisions based on a number of grounds. She first contends that the ALJ violated his duty to develop the record by not collecting her medical

9

records[2] and by not questioning her regarding impairments and current treatment. (Doc. 20 at 3-8.)

She argues that the Appeals Council erred in refusing to consider x-ray and MRI evidence that was

completed and submitted after the ALJ's decision. (AR 5.) She next asserts that the RFC finding is

contrary to the evidence. (*Id.* at 8-10.) She further argues that the ALJ's reliance on the grids was

error due to her nonexertional impairments of pain and obesity. (*Id.* at 10-12.) Finally, she alleges

that the ALJ incorrectly stated the burden at step five by reciting, "Although the claimant generally

continues to have the burden of proving disability at this step, a limited burden of going forward

with the evidence shifts to the Social Security Administration." (*Id.* at 12-13 (quoting AR 14).)

### ALJ DUTY TO DEVELOP RECORD

"It is beyond dispute that the burden to prove disability in a social security case is on the

claimant." *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997) (citing *Hill v. Sullivan*, 924

F.2d 972, 974 (10th Cir. 1991)). Because a social security disability hearing is a nonadversarial

proceeding, though, the ALJ is responsible for ensuring "that an adequate record is developed during

the disability hearing consistent with the issues raised." *Id.* (quoting *Henrie v. United States Dep't*

*of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993)). The ALJ's duty to develop an

adequate factual record is heightened where the claimant appears before the ALJ without the

---

[2] In her reply brief, following the Commissioner's response that there were treating physician documents before the ALJ, Romero alters her argument and asserts that a "clearly marked exhibit list" is extremely important. However, Romero does recognize that the ALJ is not required to prepare an exhibit list, and so I decline to address this issue. Romero claims that the ALJ's failure, if he did have those records before him, was in not "discuss[ing] them in any meaningful fashion" or referring to them by provider name or exhibit number in his decision. (Doc. 25 at 2.) In response to the Commissioner's argument that a consultative examination was provided, Romero asserts that this does not displace the ALJ's duty to obtain treating source records and that the ALJ should have considered using her treating physician to conduct the consultative examination. (*Id.* at 3-4.) Because Romero did not have a treating physician at the time that the examination was ordered, I conclude that this argument is without merit.

assistance of counsel. *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006) (citations omitted). A violation of the duty to develop the record is legal error requiring remand. *Id.* at 791-92.

A.    *Requesting Medical Records*

In general, the ALJ's duty to develop the record encompasses obtaining "pertinent, available medical records which come to his attention during the course of the hearing." *Madrid*, 447 F.3d at 790 (quoting *Carter v. Chater*, 73 F.3d 1019, 1022 (10th Cir. 1996)). However, the ALJ need not request all of the claimant's medical records in existence; he is only required to develop a record containing sufficient evidence upon which he can make an informed decision. *See Cowan v. Astrue*, 552 F.3d 1182, 1187 (10th Cir. 2008).

In *Madrid*, the administrative record included documentation establishing that the claimant had seen a specialist where he underwent a test to determine whether he had a rheumatological disorder. 447 F.3d at 790-91. The test was not included in the record. *Id.* The ALJ acknowledged the records, but dismissed the possibility of a rheumatological disorder because he found no evidence of a rheumatology work-up. *Id.* at 791. The Tenth Circuit found that the ALJ's failure to request the readily available test results or to order a consultative examination if the results were not available required reversal. *Id.* at 791-92. However, the court found that the same claimant's allegation that the ALJ violated his duty in failing to request treatment notes or records generated after a specific date was "too general" because the claim does not tell the court whether the records "are pertinent or available." *Id.* at 792.

In a later case, the administrative record contained evidence of the claimant's daily activities and physical abilities, a Psychiatric Review Technique form, and no contradictory medical or other evidence. *Cowan*, 552 F.3d at 1187. The Tenth Circuit found that the record in that case was

sufficient for the ALJ to make a disability determination and so there was no need to further develop the record. *Id.*

Here, Romero claims that the duty to develop the record was violated because the ALJ failed to request records from the doctors that she saw for her shoulder in 2003 and listed on her "Disability Report Form." (Doc. 20 at 4; AR 98.) She claims that the duty was further violated by the ALJ failing to request records from Drs. Macias and Stevenson, who Romero saw from 2007 through the time of the ALJ's decision and who were listed on an updated medication and medical treatment form. (Doc. 20 at 4; AR 130-131.) The Commissioner asserts that the duty was not violated when the ALJ chose not to request records from 2003; he claims that the relevant disability period ran from the date of Romero's application, three years after she concluded treatment with those doctors. (Doc. 24 at 3.) Further, the Commissioner states that the records from Drs. Macias and Stevenson were included in the record before the ALJ. (*Id.* at 4.) Romero disputes neither that the disability period began on the date of her application nor that the more recent records were actually before the ALJ. Instead, she argues that the 2003 records would still be relevant to Romero's medical history. (Doc. 25 at 1.) She further claims that the ALJ failed in his duty by failing to discuss the more recent records in any meaningful fashion. (*Id.* at 2.)

Central to this discussion is the relevant period of disability. Romero alleges a disability onset date of March 1, 2003; she applied for SSI on September 14, 2006; and the ALJ rendered his decision on March 4, 2009. It is clear that the end point for the relevant time period is the date of the ALJ's decision. *See* 20 C.F.R. § 416.330 (providing that an application for SSI benefits remains in effect from the date it is filed until the SSA makes a "final determination" or until the "hearing decision is issued"); *Krauser v. Astrue*, --- F.3d ---, No. 10-5103, 2011 WL 1718892, at *9 (10th Cir. May 6, 2011). The starting point, however, is less clear. Pursuant to statute and regulation, the ALJ

is required to develop a claimant's complete medical record by obtaining medical records for at least twelve months prior to the date that the claimant applied for benefits. 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. § 416.912(d) ("Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary . . . ."). There is no Tenth Circuit case on point, but at least three other circuits have suggested that because SSI benefits are not payable prior to the month after the application is filed, the relevant period begins on the date of the application. *Torres v. Chater*, 125 F.3d 166, 171 n.1 (3d Cir. 1997); *Anderson v. Sec'y of Health & Human Servs.*, 43 F.3d 1471 (Table), 1994 WL 696087, at *1 (6th Cir. 1994); *Cruse v. Bowen*, 867 F.2d 1183, 1185 (8th Cir. 1989); *see also* 20 C.F.R. § 416.335. This conclusion appears to conflict with the statute and regulation requiring the collection of medical evidence from at least twelve months prior to the date of the application for SSI benefits. It further seems to contravene other regulations requiring the claimant to provide evidence of disability "during the time" she claims she is disabled, 20 C.F.R. § 416.912(c), and mandating that the ALJ "obtain a longitudinal picture of [the claimant's] overall degree of functional limitation." 20 C.F.R. § 416.920a(c)(1).

However, I need not conclusively decide when the relevant period began because I find that, even if Romero's medical records from 2003 were within the relevant period, the ALJ's failure to request the records was not reversible error. The medical evidence related to Romero's shoulder impairment that was before the ALJ consisted of records from Romero's treating physicians from 2008, the report from the consultative examination conducted by Dr. Lacy, and the RFC Assessment completed by Dr. Kando. Based on that evidence, the ALJ found that Romero has a severe impairment of right shoulder and bicep tendinitis. There was no need to further develop the record

13

as to Romero's shoulder impairment because sufficient information existed for the ALJ to make his disability determination. *See Cowan*, 552 F.3d at 1187. Romero's allegation regarding the 2003 medical records does not include any explanation of whether the records are pertinent or how the records would impact the ALJ's decision regarding Romero's shoulder impairment. I decline to send the ALJ on a fishing expedition for records that may or may not be pertinent. *See Madrid*, 447 F.3d at 792; *Carter*, 73 F.3d at 1022.

B.     *Questioning at Hearing*

The ALJ's duty to adequately develop the factual record also includes the duty to use reasonable judgment in order to "fully and fairly" develop the record as to "material issues" at the benefits hearing. *Hawkins*, 113 F.3d at 1168 (quoting *Baca v. Dep't of Health & Human Servs.*, 5 F.3d 476, 479-80 (10th Cir. 1993)). In deciding whether this duty was satisfied, the key inquiry is whether enough questions were asked "to ascertain (1) the nature of a claimant's alleged impairments, (2) what on-going treatment and medication the claimant is receiving, and (3) the impact of the alleged impairment on a claimant's daily routine and activities." *Thompson v. Sullivan*, 987 F.2d 1482, 1492 (10th Cir. 1993) (quotation omitted). The ALJ is not, then, required to exhaust every possible line of inquiry. *Hawkins*, 113 F.3d at 1168. Furthermore, "[t]he length or brevity of a benefits hearing . . . is not dispositive of whether or not the ALJ has met his or her obligation to adequately develop the record." *Thompson*, 987 F.2d at 1492 (quotation omitted).

Romero asserts that the ALJ failed to ask sufficient or pertinent questions during the hearing. She argues that this is evidenced by the length of the hearing before the ALJ, which lasted only fourteen minutes. (AR 20-28.) Romero was the only person to testify during the hearing. (AR 20.) The ALJ asked about Romero's age, education, height, weight, household, and work. (AR 22-23.) He then questioned her about her shoulder injury and treatment, and she responded that she was

given two different opinions about whether her rotator cuff was torn. (AR 24-25.) He then asked about her low back, and Romero indicated that the pain had been getting worse, that it affects her right leg, and that she now feels pressure in her back to the point where she cannot move. (AR 25.) Without any inquiry by the ALJ, Romero elaborated that she had received injections and prescription medication for her back and is undergoing therapy. (AR 26.) The ALJ asked about pain from arthritis. (*Id.*) He then questioned her about how her conditions are affecting her everyday life at home. (AR 26-27.)

Though the ALJ asked Romero about many of the pertinent topics during the benefits hearing, he failed to develop the record about others. The ALJ did question Romero about her claims of disability, including her shoulder, her back, and her arthritis. He questioned her about how her shoulder injury was treated. He questioned her on how the alleged impairments affect her daily routine.[3] However, he did not question her about her diagnoses of type II diabetes or hypertension, both of which he mentioned in his decision. He did not question her about how her obesity impacts her daily activities, if at all. Furthermore, he did not question her about her ongoing treatment and medication for the back pain or obesity. Romero offered some information about her back treatment, stating that injections were administered, medication was prescribed, and she was undergoing therapy. The ALJ failed to ask any follow-up questions about this information, such as who her doctors were, what type of injection she received or how frequently she got it, what sort of prescribed medication she was taking, and what the therapy included. He also failed to ask any follow-up question to determine whether the treatment was helping to ease the pain.

---

[3] Romero alleges another error: that the ALJ failed to question her about sleep problems due to her pain. (Doc. 20 at 6; Doc. 25 at 5.) However, the ALJ did not have the medical records before him that indicated Romero was experiencing sleep problems until immediately prior to the hearing. (*See* AR 21,190.) Clearly, the ALJ had no basis upon which to ask a question about Romero's ability to sleep.

Though the ALJ is not required to pursue every avenue of questioning, there are some areas that he must ask about to demonstrate that he used reasonable judgment to fully develop the record as to all material issues. *See Hawkins*, 113 F.3d at 1168. One of these areas is the claimant's on-going treatment. *See Thompson*, 987 F.2d at 1492. Had the ALJ questioned Romero about this area, he could have determined whether any other pertinent medical records were available. Furthermore, he could have more accurately determined the credibility of her statements about the severity of her pain. By failing to ask about Romero's on-going treatment for certain impairments, the ALJ violated his duty to develop the record. This failure requires that the case be remanded for further factual development.

C.      *Consultative Examination*

The SSA has "broad latitude" in deciding whether to order a consultative examination. *Hawkins*, 113 F.3d at 1166 (citing *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 778 (10th Cir. 1990)). A consultative examination will generally not be ordered until all readily available medical records from treating sources are obtained. 20 C.F.R. § 416.919a(a)(1). However, a consultative examination may be ordered where the evidence as a whole is insufficient to support a decision on the claim, where additional evidence is needed but is not contained in the medical records, where the evidence is contradictory, or where a change in the claimant's condition is likely to affect her ability to work and the current severity of the impairment is not established. 20 C.F.R. § 416.919a(b); *see also Hawkins*, 113 F.3d at 1166.

Romero argues that the SSA should have ordered a consultative examination to determine the cause of Romero's back pain. (Doc. 20 at 6-8.) She also argues that the SSA should have sent her for further exploration of the extent of her shoulder problems based on Dr. Lacy's recommendation for further investigation. (Doc. 20 at 4-5.) She acknowledges that the SSA did

16

order one consultative examination with Dr. Lacy, but asserts that it was insufficient because the examination was two years old by the time of the benefits hearing. (*Id.* at 7-8.) The Commissioner argues that the SSA did develop the record sufficiently by sending Romero to Dr. Lacy. (Doc. 24 at 5.) He states that the duty to further explore Romero's shoulder problems was satisfied by questioning Romero about shoulder bicipital tendinitis. The Commissioner asserts that the examination sought by Romero would not have assisted in determining her functional limitations, which was the only issue after the ALJ found that she had serious impairments. (*Id.* at 4-5.)

The ALJ did not commit error by failing to order a second consultative examination, and the SSA need not order a consultative examination on remand though it is within its discretion to do so. Here, one consultative examination was ordered. (AR 138-42.) At the time of the consultative examination, Romero did not have any treating physicians. That is no longer the case. Romero's treating physicians are presumably addressing all of her alleged impairments. Any additional information needed to make an informed decision will likely be available from Romero's medical records or from seeking clarification from Romero's medical providers. There is no indication that a second consultative examination would be required on remand. However, I note that questioning Romero's treating physicians or obtaining an additional consultative examination could help the ALJ determine Romero's current functional limitations.

### APPEALS COUNCIL CONSIDERATION OF NEW EVIDENCE

The Appeals Council is required to consider newly submitted evidence if it is new, material, and related to the time period of or prior to the ALJ's decision. *Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003) (citations omitted). Evidence is new if it is not duplicative or cumulative and material if the evidence would have a reasonable probability of changing the outcome. *Id.* (citations omitted). To be pertinent, the evidence must relate to the time period for which benefits were denied.

*Boone v. Apfel*, No. 98-7176, 189 F.3d 477 (Table), at *2 (10th Cir. Aug. 26, 1999) (citing *Hargis v. Sullivan*, 945 F.2d 1482, 1493 (10th Cir. 1991)). The reviewing court determines *de novo* whether the Appeals Council properly rejected new evidence as non-qualifying. *Krauser v. Astrue*, --- F.3d ---, No. 10-5103, 2011 WL 1718892, at *2 (10th Cir. May 6, 2011) (citation omitted). If the Appeals Council fails to consider qualifying new evidence, the case should be remanded for further consideration. *Threet*, 353 F.3d at 1191.

Romero relies primarily on *O'Dell v. Shalala*, 44 F.3d 855 (10th Cir. 1994), to argue that the Appeals Council failed to consider her new, material, chronologically pertinent evidence of her spine x-rays and MRI. (Doc. 20 at 5.) In *O'Dell*, the bases for the claimant's disability included severe knee pain and incapacitation. 44 F.3d at 857. The ALJ found no medical evidence that the claimant suffered from a disabling knee condition and, despite various other medical problems, concluded that she was capable of doing light work. *Id.* The claimant submitted two additional pieces of information to the Appeals Council: (1) a radiologic report showing a degenerative knee condition, and (2) a physician's letter noting that the degenerative disease had been ongoing since at least a year prior to the ALJ decision. *Id.* The Tenth Circuit concluded that the documents were new evidence that became part of the record for review, though the new evidence did not change the outcome of the case. *Id.* at 859.

That case is distinct from the case at hand. While one might infer that the evidence submitted to the Appeals Council, including the x-rays and MRI showing severe degenerative changes, was chronologically relevant, Romero submitted no physician's opinion stating that the results were relevant to the period prior to the ALJ's decision. Without such an opinion, I cannot conclude that the Appeals Council erred by failing to consider the evidence.

Despite reaching the conclusion that the Appeals Council did not err in refusing to consider the new evidence presented, I have explained above that this case will be remanded to the Commissioner for further proceedings in light of other error. This extends "the potential period of disability through the next date of decision . . . ." *Krauser v. Astrue*, --- F.3d ---, No. 10-5103, 2011 WL 1718892, at *3 (10th Cir. May 6, 2011) (citations omitted); *see also* 20 C.F.R. §§ 416.330, 416.1484(a). Thus, on remand, the ALJ should consider the impact of Romero's x-rays, MRIs, and other medical reports in determining Romero's disability and functional limitations for that additional period. *See Krauser v. Astrue*, --- F.3d ---, No. 10-5103, 2011 WL 1718892, at *3 (10th Cir. May 6, 2011); *Hargis*, 945 F.2d at 1493.

## RFC FINDING

Generally, administrative decisions are entitled to deference by the courts. *See United States v. Morgan*, 313 U.S. 409, 422 (1941). However, administrative decisions about an SSI claimant's RFC are subject to review by the court, and ALJs are required to follow certain guidelines in making RFC determinations. For example, the ALJ must support his findings with a specific weighing of the evidence; otherwise, it is impossible to assess whether the ALJ's decision is supported by substantial evidence. *See Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). Although the ALJ is not required to discuss every piece of evidence, he must discuss uncontroverted evidence that he chooses not to rely on and significantly probative evidence that he rejects. *Id.* at 1009-10. Additionally, when the ALJ finds that the claimant's testimony was not fully credible, he should discuss which testimony was credible and which was not credible. *See Hayden v. Barnhart*, 374 F.3d 986, 992-94 (10th Cir. 2004).

Here, the ALJ did weigh the evidence and did discuss the why he found a portion of Romero's testimony lacked credibility. (*See* AR 15-17.) However, he incorrectly described the more

recent treatment that Romero received for her conditions. The ALJ stated that she had been given "conservative treatment" and that she dealt with her pain through over-the-counter medication exclusively aside from the Vicodin she was briefly prescribed in 2006. (AR 16.) At the benefits hearing, though, Romero presented the ALJ with records clearly stating that she had been prescribed a number of medications for pain, was undergoing physical therapy due to her back pain, and was referred for an MRI. (*See* AR 130-31,190, 193.) Furthermore, the ALJ failed to mention Romero's severe impairment of obesity and any impact that it could have on her functional abilities. However, because the record was not sufficiently developed, I cannot make a determination as to whether there is substantial evidence to support the ALJ's decision. On remand, the ALJ must weigh the evidence gathered in further developing the record as well as any records from the additional period as discussed above.

## ALJ USE OF GRIDS

Because I cannot determine whether the RFC determination is supported by substantial evidence, I necessarily cannot determine whether the ALJ erred by relying conclusively on the grids. It is important to note, though, that the ALJ in this case did rely conclusively on the grids. (*See* AR 17.) An ALJ is generally permitted to rely exclusively on the medical-vocational grids to determine whether there are jobs in sufficient numbers available in the national economy. *Heckler v. Campbell*, 461 U.S. 478 (1983). However, the ALJ may only use the grids conclusively if the claimant: (1) has no significant nonexertional impairment; (2) can do the full range of work at some RFC level on a daily basis; and (3) can perform most of the jobs in that RFC level. *Thompson*, 987 F.2d at 1488. The mere presence of a nonexertional impairment, though, does not preclude reliance on the grids where the impairment does not affect the claimant's ability to work. *See id.*

Here, the ALJ found that Romero had a severe impairment of obesity.[4] (AR 4.) This is a nonexertional impairment. *See Burns v. Apfel*, 145 F.3d 1345 (Table), 1998 WL 278535, at *3 (10th Cir. June 1, 1998) (unpublished); *Hammock v. Bowen*, 879 F.2d 498, 503-04 (9th Cir. 1989). The ALJ certainly could have concluded that Romero's obesity had a negligible effect on the range of jobs available to her and that she could still do the full range of work at some RFC level on a daily basis. However, he is required to back such findings with evidence to substantiate them. *See Thompson*, 987 F.2d at 1492 (citations omitted); *Talbot v. Heckler*, 814 F.2d 1456, 1465 (10th Cir. 1987). The ALJ did not discuss the impact of Romero's obesity on her other impairments, her functional capacity, or her ability to do other jobs available in the national economy. *See DeWitt v. Astrue*, 381 F. App'x 782, 785-86 (10th Cir. 2010) (unpublished) (remanding where the ALJ did not indicate in his decision how or whether the claimant's obesity affected the RFC assessment); SSR 02-1p at *7. On remand, if the ALJ finds that Romero has a severe impairment of obesity, he must either obtain testimony from a vocational expert or support a finding that the nonexertional impairment has a negligible effect on her RFC such that reliance on the grids is permissible.

### STATEMENT OF THE BURDEN AT STEP FIVE

Undoubtedly, at the fifth step, the burden of proof shifts to the SSA. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Williams*, 844 F.2d at 751. Thus, the SSA is required to provide evidence demonstrating "that other work exists in significant numbers in the national economy that [the claimant] can do, given [the claimant's] residual functional capacity and vocational factors."

---

[4] Romero also argues that the ALJ should not have relied on the grids because she suffers from extreme pain. (Doc. 1 at 10-12.) As discussed above, the ALJ's finding regarding Romero's back problem and resulting pain suffered from a variety of defects related to the development of the record. Thus, I do not address the nonexertional impairment of pain here. However, I note that if the ALJ concludes on remand that Romero does suffer from the nonexertional impairment of pain, the same standards that I discuss below apply.

20 C.F.R. §416.960(c)(2). The regulations clearly state, though, that the SSA will use the already determined RFC and that the SSA is not responsible for providing any additional evidence about the claimant's RFC. *Id.*

In this case, the ALJ stated his step five burden as follows:

> Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience.

(AR 14.) This statement of the burden of proof comports with the regulations and the case law. Furthermore, Romero fails to counter the Commissioner's argument that this is a correct statement of the regulations and the law. (*See* Doc. 24 at 9; Doc. 25.) I conclude that this is not a legal error and the ALJ need not alter this statement on remand.

## CONCLUSION

For the reasons stated above, the motion to reverse or remand is granted, and this matter is remanded for proceedings consistent with this order.

William P. Lynch
United States Magistrate Judge